IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Hartle et al., <br>     Plaintiffs, <br>     v. <br> FirstEnergy Generation Corp., <br>     Defendant. | Civil Action No. 08-1019 |
| Patrick et al., <br>     Plaintiffs, <br>     v. <br> FirstEnergy Generation Corp., <br>     Defendant. | Civil Action No. 08-1025 |
| Price et al., <br>     Plaintiffs, <br>     v. <br> FirstEnergy Generation Corp., <br>     Defendant. | Civil Action No. 08-1030 |

**MEMORANDUM OPINION**

Conti, Chief District Judge

## I. Introduction

Before the court are motions for reconsideration filed by plaintiffs in *Hartle v. FirstEnergy Generation Corp.* (No. 08-1019), *Patrick v. FirstEnergy Generation Corp.* (No. 08-1025), and *Price v. FirstEnergy Generation Corp.* (No. 08-1030).[1] Plaintiffs seek reconsideration of the court's opinions and orders limiting or excluding plaintiffs' expert witnesses Wayne C. Isphording ("Isphording"), PhD, and James R.

---

1     These three cases are consolidated for discovery purposes. The motions for reconsideration are ECF No. 187 (*Hartle*), ECF No. 292 (*Patrick*), and ECF No. 200 (*Price*). Unless otherwise specified, ECF numbers appearing in the text of the opinion refer to the *Patrick* case.

1

Millette ("Millette"), PhD,  (ECF Nos. 278, 279) and Gary Brown ("Brown") (ECF Nos. 285, 287). Alternatively, plaintiffs request clarification of these orders.

The court issued a series of opinions about expert testimony in its "gatekeeping role" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and its progeny. In all, the court issued eight opinions considering nineteen experts and ruling on forty-four *Daubert* motions. The opinions and orders plaintiffs wish the court to reconsider are in this series.

These cases involve allegations of air pollution emitted by the Bruce Mansfield Power Plant ("Bruce Mansfield"), a coal-fired electric generation facility operated by defendant FirstEnergy Generation Corporation ("defendant" or "FirstEnergy"). Plaintiffs are individuals and a putative class who reside in the area surrounding Bruce Mansfield. Plaintiffs allege that pollution from Bruce Mansfield caused personal injury and property damage. Plaintiffs seek equitable relief and monetary damages under theories of nuisance, trespass, and negligence.

Plaintiffs sought to offer the opinion testimony of Isphording and Millette about analysis performed on soil and dust samples they collected in and around Bruce Mansfield and the surrounding communities, including on property owned by plaintiffs. Isphording concluded these samples showed that fly ash from Bruce Mansfield was deposited on plaintiffs' properties. (Mem. Op. 6, ECF No. 278.) Millette opined that particles collected on plaintiffs' properties matched samples taken from Bruce Mansfield. (*Id.* at 9–10.) FirstEnergy moved to exclude the testimony of Isphording and Millette under Rule 702 of the Federal Rules of Evidence and *Daubert.* FirstEnergy asserted that Isphording's methodology lacked reliability and his opinion lacked "fit," meaning it would not "help the trier of fact to understand the evidence or to determine a fact in issue." *In re Paoli R.R. Yard PCB Litig.* (*Paoli II*), 35 F.3d 717, 743 (3d Cir. 1994). FirstEnergy also challenged Isphording's qualifications to the extent his report contained opinions about air

2

dispersion modeling, pollution controls, and the health effects of air pollution. The challenges to Millette's testimony were on reliability and fit grounds.

The court determined that the testimony of Isphording and Millette would not help the finder of fact decide a fact in issue and excluded their testimony. (Mem. Op. 7, 10, ECF No. 278.) Specifically, while Isphording identified particles found on plaintiffs' properties as fly ash from Bruce Mansfield, the court found that he could not determine when the fly ash particles were emitted from the plant. (*Id.* at 7.) Isphording was also unable to determine how the particles were emitted—that is, whether the particles were emitted as part of the white rain and black rain episodes at issue in the case or through some other mechanism, such as dry fly ash emission, which is not at issue in the case. (*Id.*) Millette was also unable to identify when or how particles from Bruce Mansfield reached plaintiffs' properties. (*Id.* at 10.) The exclusion of the testimony of Isphording and Millette was without prejudice. The court noted that it would reconsider the admission of their testimony should FirstEnergy introduce evidence or argue that no fly ash particles from Bruce Mansfield reached plaintiffs' properties. (*Id.* at 9 n.6, 10 n.7.) The court did not reach the methodology and qualification challenges raised by FirstEnergy.[2]

## II. Standard of Review

The court may grant a motion for reconsideration if the party seeking reconsideration establishes one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood*

---

2   This motion was thoroughly briefed. In addition to plaintiffs' motion (ECF No. 292) and FirstEnergy's response (ECF No. 293), plaintiffs filed a reply brief (ECF No. 296) and FirstEnergy filed a surreply brief (ECF No. 299). The court asked the parties to file supplemental briefs identifying which claims, if any, related to dry particulate. Plaintiffs (ECF No. 305) and FirstEnergy (ECF No. 308) addressed this issue.

*Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). A finding of clear error is appropriate when the record supports "'the definite and firm conviction that a mistake has been committed.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)).

Because of the interest in finality, district courts grant motions for reconsideration sparingly—the parties are not free to relitigate issues the court has already decided. *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992); *see Williams v. City of Pittsburgh*, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998) ("[A] motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly.").

### III. Discussion[3]

#### A. Exclusion of Isphording's Testimony

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. This standard is "higher than bare relevance," but it is "not that high." *Paoli II*, 35 F.3d at 745. Whether testimony meets this standard "depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Id.* at 743 (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)). The Third Circuit Court of Appeals illustrated the helpfulness or "fit" prong with the following example:

> [A]nimal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in

---

3   Plaintiffs did not explicitly identify which of the three grounds for reconsideration applies to their motion. Since plaintiffs do not reference any intervening change in the governing law or availability of new evidence, it is apparent that plaintiffs seek reconsideration on the basis of clear error.

4

> humans. … For example, in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves. Thus, the requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.

*Id.*

The court excluded Isphording's testimony because he could not determine "when or how the particles he identified came to be on plaintiffs' properties." (Mem. Op. 9, ECF No. 278.) Thus, even if Isphording had good grounds for his conclusion that the fly ash particles he found were from Bruce Mansfield, there were not good grounds to connect those particles to a black rain or white rain event during the relevant time period.

In response to the court's conclusion that Isphording was unable to identify when the fly ash reached plaintiffs' properties, plaintiffs point to three portions of Isphording's testimony at the *Daubert* hearing in which he offered opinions with respect to the age of the fly ash. (ECF No. 292, ¶¶ 11–12.) Isphording testified that he collected wipe samples from a car that had been recently washed (Hr'g Tr. 15:15–19, Jan. 13, 2014, ECF No. 275), the presence of gypsum in a sample indicated that it was "at the most" thirty to sixty days after deposit (*id.* at 37:18–20), and sampling of the upper inch of soil indicated recent ash fall (*id.* at 83:9–18). Isphording, however, gave conflicting testimony on this point. He stated, "I can't tell you when [the fly ash] got onto the property," and, while he could determine that fly ash associated with gypsum was "undoubtedly recent," he could not tell whether the "gypsum originated six months ago or six weeks ago." (*Id.* at 34:12–22.)

Despite any inconsistencies in Isphording's testimony—and setting aside any question about its reliability—a jury could conclude from his testimony that the fly ash particles he examined were recently emitted by Bruce Mansfield. Given the low

5

bar to admissibility posed by the helpfulness prong of Rule 702, it is clear that Isphording's testimony referred to a general time within the relevant period and should not be excluded due to an inability to identify exactly when the particles were emitted. The court will vacate the portion of its opinion excluding Isphording's testimony on this basis.

The other basis upon which the court excluded Isphording's testimony was his inability "to determine whether the fly ash particles were deposited in a white or black rain episode or by another mechanism not at issue in these cases." (Mem. Op. 7, ECF No. 278.) During the *Daubert* hearing, the parties argued at length about this issue. Defendant argued that Isphording could not identify whether the fly ash he detected was emitted as dry particulate or white rain. (Hr'g Tr. 119:22–120:2, Jan. 14, 2014, ECF No. 276.) Plaintiffs responded that Isphording's conclusions corroborate the findings of their air-modeling experts that white rain fell on plaintiffs' properties. (*Id.* at 120:17–19.) Plaintiffs acknowledged, however, that Isphording's testimony could also corroborate the emission of dry fly ash by Bruce Mansfield. (*Id.* at 121:5–7.) Plaintiffs argued it was for the jury to decide between these competing possibilities. (*Id.* at 121:8.)

Defendant again raised the issue of the mechanism by which fly ash reached the properties in its response to the motion for reconsideration. Defendant asserted that the deposition of fly ash particles as "dry particulate" is, unlike white rain or black rain, "not at issue in the case." (Def.'s Resp. 4, ECF No. 293.) Plaintiffs argued that defendant may be liable for nuisance whether Bruce Mansfield emitted fly ash as dry particulate or entrained in water droplets as white rain. (Pls.' Reply 1 & n.1, ECF No. 296.) Thus, plaintiffs argued, it would be inequitable for them to need to differentiate between wet and dry emissions. (*Id.*) Defendant asserted that the only property damage claims in the case relate to damages from white rain and black rain events, not damages from emission of dry particulate. (Def.'s Surreply 1–2, ECF No. 299.)

The court sought clarification about the claims at issue in these cases. The parties submitted supplemental briefs addressing which claims, if any, involve dry particulate or fly ash not deposited as part of a white rain or black rain event. Plaintiffs stated that their "real property value diminution claims … relate to the white and black stack rain events, and not to any particulate or fly ash emitted dry from [Bruce Mansfield's] smoke stacks (*i.e.* as opposed to emitted or deposited as part of a white or black rain event)." (Pls.' Supplemental Br. 1, ECF No. 305.) Although plaintiffs assert separate claims related to the health effects of dry particulate and the need for a health assessment study, Isphording's testimony is not relevant to these claims. (*Id.* at 2–3.) Since the only relevant claims involve white or black rain, and since Isphording cannot distinguish between fly ash emitted as white or black rain and fly ash emitted as dry particulate, his testimony must still be excluded on helpfulness grounds.

Plaintiffs argue that although Isphording cannot distinguish between wet and dry particulate, "'the sum of an evidentiary presentation may well be greater than its constituent parts.'" (Pls.' Mot. ¶¶ 14–15, ECF No. 292 (quoting *Huddleston v. United States*, 485 U.S. 681, 691 (1988)).) Plaintiffs assert that Isphording's testimony is relevant when viewed in combination with that of their other expert and lay witnesses.[4] From the standpoint of pure relevance, plaintiffs may be correct. Evidence that fly ash from Bruce Mansfield reached plaintiffs' properties has probative value and would tend to make more likely the disputed fact that white

---

4  The other evidence plaintiffs point to is

> the fact that the involved sample was taken from a property that was within the modeled "white rain" and "black rain" zones, eyewitness accounts of seeing the stack rain hit the property or personal property or washed from the property or belongings to a particular location, and operation data that demonstrates that stack rain was being emitted close in time to the sampling events.

(Pls.' Reply 4, ECF No. 296.)

rain invaded plaintiffs' properties. *See* Fed. R. Evid. 401. The helpfulness prong of Rule 702, however, requires more than just bare relevance. *Paoli II*, 35 F.3d at 745. There must be a scientific connection between the test results and a fact at issue. *Id.*

In this case, the scientific connection between the test result showing the fly ash originated from Bruce Mansfield and the disputed issue of whether Bruce Mansfield caused white or black rain to fall on plaintiffs' properties is lacking. The other evidence plaintiffs point to—air modeling analysis, eyewitness testimony, and operational data—does not create a *scientific* connection between Isphording's results and white rain. Isphording, with his expertise and after reviewing the air models, eyewitness reports, and operational data, cannot conclude that the fly ash was deposited as white or black rain. A lay jury may not properly conclude from Isphording's testimony that the source of the fly ash was white or black rain from Bruce Mansfield.[5] His testimony would invite the jury to speculate and reach a scientific conclusion where none is justifiable. Proposed expert testimony that would mislead the jury or that does not speak clearly and directly to an issue in dispute in the case must be excluded. *See United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007); Fed. R. Evid. 403.

Isphording's testimony speaks clearly and directly to the issue of whether fly ash from Bruce Mansfield reached plaintiffs' properties. This issue is not in dispute. The court asked defendant's counsel whether defendant intended to argue that no white rain from Bruce Mansfield fell on plaintiffs' properties because there has been no showing that any fly ash reached those properties. (Hr'g Tr. 126:22–25, Jan. 14, 2014, ECF No. 276.) The court was advised that defendant will not make that argument. (*Id.* at 127:10.) Defendant further stated in its response that it "does not

---

5   Although Isphording's testimony will be excluded, the air modeling analysis, eyewitness testimony, and operational data is admissible. Whether a jury could conclude from this evidence that white or black rain from Bruce Mansfield landed on plaintiffs' properties is not an issue currently before the court.

8

dispute that fly ash particles from [Bruce Mansfield] can be found in soil and surface samples." (Def.'s Resp. 4, ECF No. 293.) This is a judicial admission. *See Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) ("Judicial admissions are concessions in pleadings or briefs that bind the party who makes them."). Isphording's testimony on this issue is therefore unnecessary.

Plaintiffs argue that *Daubert* does not require experts to have "superpowers." *Fischer v. Ciba Specialty Corp.*, Civil No. 03-566, 2007 WL 2302470, at *8 (S.D. Ala. Aug. 8, 2007). In *Fischer*, a case involving DDT contamination, the court rejected the defendant's contention that the plaintiffs' expert should be excluded because he never gave a "simple step-by-step explanation of how and when the DDT arrived at the Plaintiffs' properties." *Id.* (internal quotation marks omitted). The court in that case "strongly doubt[ed] that any scientist could definitively testify that a particular granule of DDT contamination arrived on plaintiff X's property on a particular day in a particular quantity via a particular mechanism." *Id.*

*Fischer* is inapposite for two reasons. First, at issue in *Fischer* was the reliability of the expert testimony, not fit. *Id.* Second, the particular mechanism by which DDT reached the plaintiffs' properties was not a relevant consideration in *Fischer*. *Id.* at *7. It was enough in that case for the expert to show, through an inferential analysis, that (1) the defendant's facility emitted DDT, (2) DDT travels through atmospheric dispersion, and (3) the DDT on the plaintiffs' properties came from defendant's facility because alternative sources of DDT were ruled out. *Id.* In this case, by contrast, there are two mechanisms by which fly ash from Bruce Mansfield could have reached plaintiffs' properties. White and black rain are at issue, but fly ash emitted as dry particulate is not relevant to the property value diminution claims. Experts need not have superpowers and plaintiffs need not prove their case twice— once to show their expert testimony is admissible and once to the jury. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The court is not requiring Isphording to testify that a particular fly ash particle reached a particular plaintiff's property on a

particular day by a particular mechanism. Since Isphording cannot distinguish between two possible mechanisms by which the fly ash reached plaintiffs' properties, one of which does not support a finding that Bruce Mansfield caused white or black rain on plaintiffs' properties, his testimony would not be helpful to the trier of fact.

### B. *Exclusion of Millette's Testimony and Limitation on Brown's Testimony*

The court excluded Millette's testimony for the same reasons it excluded the testimony of Isphording. The court limited Brown's testimony. Brown's opinion with respect to contamination due to black rain was sufficiently reliable, but his opinion about white rain, which was based upon the opinions of Millette, was excluded. Brown collected soil samples from locations where, according to plaintiffs, black rain residue had accumulated after being washed off a building and a deck. (Pls.' Mot. ¶ 16, ECF No. 292.) Plaintiffs argue that these circumstances demonstrate "when" and "how" the material arrived on the properties. (*Id.*) Plaintiffs assert that Brown should be permitted to rely upon Millette's analysis of these samples. (*Id.*) As set forth below, the court finds no basis for reconsidering these decisions.

Brown collected soil, wipe, and tape samples from the properties of certain plaintiffs, which he submitted to Millette for analysis. Millette opined that the fly ash particles in the samples taken from plaintiffs' properties were "a positive match" for particles found in samples taken from Bruce Mansfield. (Millette Rep. ¶ 16, ECF No. 164-4.) He could not identify whether the fly ash particles he examined arrived on plaintiffs' properties as dry particulate or part of a wet droplet. (Millette Dep. 27:3–9, Feb. 25, 2013, ECF No. 164-7.) Moreover, Millette was only able to opine that the fly ash on plaintiffs' properties matched the material he examined from Bruce Mansfield. (Hr'g Tr. 139:5–141:2, Jan. 14, 2014, ECF No. 276.) He did not, for example, find a unique signature that would positively identify Bruce Mansfield as the source and rule out all other sources. (*Id.* at 142:20–143:9.) This testimony could

be relevant and helpful if defendant argued that Bruce Mansfield could not be the source of fly ash found on plaintiffs' properties. Defendant advised the court it would not make this argument. (*Id.* at 141:22–142:6.)

Brown concluded that the soil samples at the properties of two plaintiffs (the "Moore property" and the "Kern property") showed elevated levels of arsenic, which he attributed to black rain from Bruce Mansfield. (Brown Rep. 72, ECF No. 169-2.) Brown based this conclusion upon air dispersion modeling, which showed the sampling locations to be in the area affected by black rain, and the statements or testimony of witnesses, who observed soot-like material on objects and the ground and a horse with a black tongue in the area where the samples were collected. (*Id.* at 39.) These samples were analyzed for arsenic content by a "PA Certified laboratory." (*Id.* at 41, ECF No. 169-1.) Millette did not perform an arsenic analysis on these samples, and Brown did not rely on Millette in reaching his conclusion that the contamination was due to black rain from Bruce Mansfield. The court found that Brown's opinion about the black rain source of elevated levels of arsenic in soil samples was sufficiently reliable to be admissible under Rule 702. (Mem. Op. 6–9, ECF No. 285.) Because this testimony was not excluded, there is nothing for the court to reconsider.

The court excluded the portion of Brown's opinion in which he attributed residue collected in wipe and tape samples to white rain. (*Id.* at 9–10.) Unlike the soil samples, the wipe and tape samples were not taken from areas where black rain runoff collected. Instead, Brown collected samples based upon his "field judgment" and "where people said, 'I think there's stuff that's fallen from here that might be from Bruce Mansfield.'" (Brown Dep. 205:10–14, Feb. 28, 2013, ECF No. 169-5.) There is no evidence that those plaintiffs who observed the "stuff" could make a determination about whether the material arrived as dry particulate or white rain. Brown made no determination about whether the wipe samples came from Bruce Mansfield. (*Id.* at 372:8–16, 374:7–15.) Instead, he relied on the opinions of Millette

and Isphording identifying Bruce Mansfield as the source of the sampled material. (Brown Rep. 38, ECF No. 169-1.) Since there is no testimony or evidence that links the deposits tested to white rain—rather than dry particulate—the court properly excluded Brown's opinion with respect to the white rain.

In addition to the wipe and tape samples, Brown submitted five soil samples to Millette for testing. Two of these samples, identified as "X0040" and "X0041," were taken from the Kern and Moore properties. These two samples were collected from areas identified as having large amounts of black rain runoff, and they were the same samples Brown submitted for arsenic testing. (Brown Dep. 353:5–16, Feb. 28, 2013, ECF No. 169-5; Millette Dep. 143:2–144:3, Feb. 25, 2013, ECF No. 164-7.) Plaintiffs argue that the sampling location is evidence of when and how the material arrived on the Moore and Kern properties and assert that Brown should be able to rely on Millette's analysis. (Pls.' Mot. ¶ 16, ECF No. 292.) To the extent plaintiffs are asserting that Brown should be permitted to rely on Millette's analysis in his white rain opinion, this argument is not persuasive. The location of the samples in an area with an allegedly high concentration of black rain material does not support a connection to white rain. Brown's black rain opinion was not based on Millette's analysis of the fly ash in the soil samples. (Brown Rep. 38–39, ECF No. 169-1 (listing the reasons why Brown attributed the high arsenic result to black rain from Bruce Mansfield).) The connection between the black rain deposition and the sample sites does not provide a basis for the court to reconsider the admissibility of Millette's opinion. Millette could only "rule in" Bruce Mansfield as a match for the particles in the Moore and Kern samples; he could not "rule out" other sources. His opinion is not helpful in determining a fact in dispute. Brown may not rely on Millette's conclusions to support his opinion that the high level of arsenic in the Moore and Kern samples was due to black rain from Bruce Mansfield. The decisions to exclude Millette's testimony and limit Brown's testimony were not clearly erroneous.

## IV. Conclusion

The motion for reconsideration will be granted in part. As set forth above, the court vacates the portion of its previous opinion that excluded the expert testimony of Isphording and Millette based upon their inability to identify when the fly ash reached plaintiffs' properties. The court will not exclude their testimony on that basis. Since Isphording and Millette, however, cannot identify whether the fly ash reached plaintiffs' properties as white rain or dry particulate, their testimony could be misleading and would not help the jury understand the evidence or determine a fact in issue. The motion for reconsideration will be denied in this respect. The motion for reconsideration of the opinion limiting the testimony of Brown will be denied.

Dated: October 29, 2014 /s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge